# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **TINA KILGORE PARKER,** | } |
| | } |
| Plaintiff, | } |
| | } |
| v. | } Civil Action No.: 2:11-CV-02682-RDP |
| | } |
| **CAROLYN W. COLVIN,** | } |
| **Acting Commissioner of Social Security,** | } |
| | } |
| Defendant. | } |

## MEMORANDUM OF DECISION

Plaintiff, Tina Kilgore Parker, brings this action pursuant to the provisions of Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for a period of disability and disability insurance benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

## I.    STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth*, at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a

reasonable person would accept as adequate to support a conclusion." *Bloodsworth*, at 1239.  This court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  Even if the court finds that the evidence preponderates against the Commissioner's decision, the court must affirm the Commissioner's decision if it is supported by substantial evidence.  *Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

**II.    STATUTORY AND REGULATORY FRAMEWORK**

In order to qualify for disability benefits and to establish entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(I).  For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step process.  20 C.F.R. § 404.1520 (a)-(f).  The Commissioner must determine in sequence:

(1)    whether the claimant is currently employed;

(2)    whether she has a severe impairment;

(3)    whether her impairment meets or equals one listed by the Secretary;

(4)    whether the claimant can perform her past work; and

>   (5)   whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993); *accord McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope*, at 477; *see Foot v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the present case, the ALJ determined Plaintiff met the first two tests, but concluded she did not suffer from a listed impairment. The ALJ found Plaintiff had the residual functional capacity (RFC) to perform "light work as defined in 20 C.F.R. § 404.1567(b) except work in a temperature controlled environment; occasional push/pull of her lower extremities; work around things and not the general public; and no excessive exposure to dust, fumes, and gases." R. 21-22. With this RFC, the ALJ found Plaintiff unable to perform past relevant work. Once it is determined that a plaintiff cannot return to her prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." *Foote*, 67 F.3d at 1559. When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). *Id.* at 1558-59. The presence of a non-exertional impairment (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids. *Id.* at 1559. In such cases "the [Commissioner] must seek expert vocational testimony." *Id.* Based on Plaintiff's RFC and expert vocational testimony, the ALJ found Plaintiff would be able to perform other work

in the national economy. R. 29-30. Therefore, he found that Plaintiff was not disabled at step five of the sequential evaluation framework. R. 30.

**III.    FACTUAL BACKGROUND**

Plaintiff alleges disability beginning August 1, 2007, primarily due to chronic obstructive pulmonary disease (COPD). Plaintiff was treated on April 13, 2007, by Dr. Key, a pulmonologist. Dr. Key noted Plaintiff had developed worsening cough, sputum production, wheezing, and shortness of breath beginning the previous year. R. 280. At the time of her visit, Plaintiff worked in a company that did rehabilitation of buildings after fires or exposure to mold. R. 280. She reported that she could "walk one mile or climb one flight of stairs limited by shortness of breath." R. 280. Dr. Key's diagnostic assessment was that Plaintiff "has significant chronic obstructive pulmonary disease secondary to cigarette smoking." R. 279.

Plaintiff returned to Dr. Key for follow-up on October 30, 2007. Dr. Key noted Plaintiff's exercise tolerance was unchanged, and her oxygen saturation was 96% on room air. R. 278. She was again counseled to quit smoking. R. 278.

On March 3, 2008, Dr. Key noted Plaintiff had no change in her exercise tolerance. R. 277. Her oxygen saturation was 97% on room air. R. 277.

The final treatment note from Dr. Key was from July 29, 2008. Plaintiff complained the hot, humid summer weather caused her to be more short of breath. R. 275. Plaintiff's oxygen saturation on room air was 99%. R. 275. Dr. Key's diagnostic assessment was that Plaintiff's COPD was "gradually worsening due to continued cigarette smoking." R. 275.

Plaintiff began seeing a new pulmonologist, Dr. Carcelen, on February 23, 2009. The treatment note states Plaintiff reported chronic respiratory symptoms, with frequent episodes of

bronchitis and a chronic cough. R. 291. Plaintiff reported becoming short of breath after walking one block and had become increasingly sedentary. R. 291. She reported she had to quit her job in the restoration business because she could not tolerate exposure to fumes and chemicals. R. 291. It was noted she had "never required hospitalization for COPD, nor frequent oral steroid use." R. 291. On physical examination Dr. Carcelen found Plaintiff's chest was hyper-expanded bilaterally, and hyperresonance was present on percussion of her chest. R. 293. Her breathing was regular and unlabored. R. 293. Auscultation of the lungs revealed diminished breath sounds, but no rales, rhonchi or wheezing. R. 293. At this visit pulmonary function testing (PFT) was performed and showed mild airflow obstruction with an FEV1 of 2.01 (76%), normal static lung volumes, and mild to moderate diffusion impairment. R. 294. Chest x-ray showed hyperinflated lungs. R. 294. Dr. Carcelen stated Plaintiff was currently on an adequate regimen for her COPD. R. 294.

Plaintiff returned to Dr. Carcelen for her scheduled follow-up on August 24, 2009. She reported overall stable symptoms and a daily productive cough. R. 410. It was noted she had not required any recent antibiotic therapy for bronchitis. R. 410. Plaintiff continued to report some shortness of breath on exertion, but was "still able to carry out her activities of daily living." R. 410. Dr. Carcelen noted Plaintiff continued to smoke between five and 10 cigarettes a day, and that previous attempts to quit with Chantix had been unsuccessful because of side effects. R. 410. Physical examination of Plaintiff's respiratory system was unchanged from her previous visit. R. 412.

On March 1, 2010, Plaintiff again saw Dr. Carcelen for follow-up visit. R. 407. Plaintiff reported she "continued with a chronic cough, intermittently productive of thick mucous plugs." R. 407. Plaintiff had been using a flutter valve device since December 2009, which assisted removal

of the mucous plugs. R. 407. On physical examination Plaintiff's respiratory effort was regular and unlabored. R. 408. Dr. Carcelen noted the presence of diminished breath sounds, scattered rhonchi, and faint wheezing. R. 408. Dr. Carcelen diagnosed an exacerbation of chronic bronchitis and tobacco abuse. R. 409. Plaintiff was prescribed an antibiotic for treatment of the exacerbation, and her prescriptions were renewed. R. 409.

When Plaintiff returned to Dr. Carcelen for her follow-up visit on September 3, 2010, she reported problems with increased coughing and chest congestion for the past 3 to 4 weeks. R. 403. On physical examination Dr. Carcelen found Plaintiff's breathing was regular and unlabored. R. 404. He also found diminished breath sounds, scattered rhonchi, and mild bilateral wheezing. R. 404. Chest x-ray showed hyperinflated lungs, and was unchanged compared with a February 2009 x-ray. R. 405. Pulmonary function testing showed "[m]oderate airflow obstruction with FEV1 1.65 (63%), about 350 ml lower than on previous study." R. 405. Dr. Carcelen diagnosed chronic bronchitis with exacerbation, and an "increase in symptoms associated with worsening spirometry." R. 405. Plaintiff's exacerbation was treated with a steroid injection and Avelox. R. 405. There were no changes in prescriptions for maintenance of plaintiff's COPD.

Plaintiff saw her primary care physician, Dr. Lamberson, for a variety of complaints. On January 12, 2009, Plaintiff presented with complaints of cough, right shoulder pain, and knee arthritis. R. 428. The assessment was acute bronchitis. R. 428. On February 18, 2009, Plaintiff reported a cold over the weekend, and that she was trying to get disability for COPD. R. 438-39. She reported difficulty inhaling due to chest pain and expectorating a large mucus wad on March 2, 2009. R. 438. On March 10, 2009, she complained of tongue blisters and was assessed with oral thrush. R. 437-38. Plaintiff was seen for complaints of headache and her bones hurting on April 7,

2009. R. 436-37. On May 15, 2009, Plaintiff's chief complaint was wheezing, and coughing up sputum. R. 436. Dr. Lamberson prescribed a cough syrup. R. 436. She again complained of tongue blisters and reflux on June 9, 2009. R. 435. Plaintiff was a little depressed on July 24, 2009, and Dr. Lamberson assessed seasonal pattern depression. R. 434. She returned on August 28, 2009, with complaints of sinus drainage and cough. R. 433-34. On September, 29, 2009, Plaintiff reported coughing and being really tired for the past week. R. 433. Her pulse oximetry was 99%. R. 433. Plaintiff reported a bad headache and a bit of back pain after playing with her grandchild on October 26, 2009. R. 432. Dr. Lamberson assessed acute pansinusitis and acute bronchitis. R. 432. On December 1, 2009, Plaintiff stated that her jaw felt "hung up" after a recent coughing spell, but her cough was a bit better controlled. R. 431. A flutter valve was prescribed to aid in the removal of mucous. R. 432. Plaintiff complained of a cough on February 9, 2010, and noted the flutter valve helped. R. 430. She returned on May 26, 2010, and reported that she had been fighting a cold for several days. R. 430. She was smoking a good bit and having trouble with her reflux on July 27, 2010. R. 429. On August 16, 2010, Plaintiff requested a refill of Nexium. R. 428.

## IV.   DISCUSSION

### A.

Plaintiff's primary argument on appeal is that the ALJ improperly rejected a medical source statement completed by her primary care physician, Dr. Lamberson, on September 7, 2010. Pl.'s Br. 7. On that form Dr. Lamberson indicated Plaintiff would be unable to sustain work activity on a regular and continuing basis during a 40 hour work week. R. 414. Dr. Lamberson also indicated Plaintiff would likely miss two or more days of work per month. R. 414. Dr. Lamberson stated Plaintiff's functionality is limited by her breathing difficulty due to COPD. R. 414. Plaintiff argues

the ALJ did not properly discredit the medical source statement from Dr. Lamberson because his reasons were not stated with sufficient particularity to allow a reviewing court to determine whether his decision was rational and supported by substantial evidence. Pl.'s Br. at 7-8.

Under the Commissioner's regulations, a treating physician's opinion will be given controlling weight if it is well supported and not inconsistent with other substantial evidence in the record.

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2). In considering whether an ALJ has properly rejected a treating physician's opinion, this court is not without guidance. "The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists when the evidence does not bolster the treating physician's opinion; a contrary finding is supported by the evidence; or the opinion is conclusory or inconsistent with the treating physician's own medical records. *Id.* If a treating physician's opinion is rejected, the ALJ must clearly articulate the reasons for doing so. *Id.* ("The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error.")

The ALJ discussed Dr. Lamberson's medical source statement and gave it little weight because "[i]t is not corroborated by the claimant's ongoing treatment records of pulmonologist, Dr. Carcelan [sic.], and is inconsistent with her own treatment records, recommendations, and objective findings." R. 28. Although this statement is brief, it does set forth the ALJ's reasons sufficiently to allow a reviewing court to determine whether they are supported by substantial evidence. Earlier

in his opinion, the ALJ had summarized the treatment records from Dr. Lamberson and Dr. Carcelen, showing that he had considered the entire medical record. *See*, *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (holding an ALJ is not required to specifically refer to every piece of evidence so long as the opinion shows the claimant's medical condition as a whole was considered).

In his consideration of Plaintiff's credibility, the ALJ noted the most recent pulmonary function testing by Dr. Carcelen showed only moderate airflow obstruction. R. 28. The ALJ also observed that Dr. Carcelen noted on that visit Plaintiff had not required systemic steroids or visits to the emergency room. R. 28. The ALJ also referred to Dr. Carcelen's treatment note of August 24, 2009, in which he stated Plaintiff "is still able to carry out her activities of daily living." R. 27, 410. These statements of the ALJ show why he believed Dr. Carcelen's treatment notes did not support Dr. Lamberson's medical source statement, and are sufficient to allow this court to review his decision not to credit Dr. Lamberson's medical source statement.

Dr. Lamberson's treatment notes show she treated Plaintiff for sporadic exacerbations of COPD. That treatment included prescriptions for cough medications, and a flutter valve device. Although Dr. Lamberson's treatment notes show she treated Plaintiff for acute bronchitis on several occasions, Dr. Carcelen was the doctor primarily treating Plaintiff's COPD. In addition, many of Dr. Lamberson's treatment notes are unrelated to Plaintiff's COPD. Because Dr. Lamberson based her medical source statement on Plaintiff's COPD, treatment notes from her treating pulmonologist showing only moderate airflow obstruction provide substantial evidence to support the ALJ's decision not to credit Dr. Lamberson's medical source statement. *See*, 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

**B.**

Plaintiff next argues that "if the ALJ felt Dr. Lamberson's opinion was inconsistent, then he had an obligation to recontact Dr. Lamberson for clarification." Pl.'s Br. 8. Plaintiff argues that 20 C.F.R. § 404.1512(e)(1) required the ALJ to attempt to resolve any inconsistency between Dr. Lamberson's medical source statement and her treatment records. The regulation on recontacting medical sources in effect at the time of the ALJ's decision provided in pertinent part as follows:

> When the evidence we receive from your treating physician or psychologist or other medical source <u>is inadequate for us to determine whether you are disabled</u>, we will need additional information to reach a determination or a decision. To obtain the information, we will take the following actions.
>
> > (1) We will first recontact your treating physician or psychologist or other medical source to determine whether the additional information we need is readily available. We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. §§ 404.1512(e)(2010)(emphasis added). Under the regulation, the duty to recontact a medical source only arises if the medical evidence of record "is inadequate "to allow the ALJ "to determine whether [a claimant is] disabled." *Id.*

In making his disability determination, the ALJ reviewed the treatment records of Dr. Carcelen and Dr. Lamberson. He found those treatment records to be inconsistent with Dr. Lamberson's medical source statement. In *Shaw v. Astrue*, 392 Fed. Appx. 684, 688-89 (11th Cir. 2010) (unpublished decision), the court faced a similar situation and concluded the ALJ was not required to recontact Plaintiff's treating physician:

> The ALJ did not err in this respect. Contrary to Shaw's argument, the ALJ only needed to recontact Dr. Naqvi if "the adjudicator cannot ascertain the basis of the opinion." Soc. Sec. Rul. 96–5p. In this case, the ALJ found that Dr. Naqvi did not

>adequately support his position, specifically finding that his opinion was contradicted by other findings and that he did not explain how Shaw would be limited. (AR at 27). In other words, the ALJ found that there was sufficient evidence, both from Dr. Naqvi's opinion and the record as a whole, to determine that Shaw was not disabled and that Dr. Naqvi's opinion was not entitled to full weight.

In the present case, the treatment records of Dr. Carcelen and Dr. Lamberson provided adequate evidence to allow the ALJ to determine whether Dr. Lamberson's medical source statement should be credited. He was not required to recontact Dr. Lamberson merely because he found her medical source statement was contradicted by her treatment notes. Therefore, the ALJ did not err in rejecting Dr. Lamberson's medical source opinion without recontacting her.

### C.

Plaintiff's final argument is that the ALJ failed to address whether she could perform work on a regular and continuing basis. Pl.'s Br. 10. This argument is dependent upon Dr. Lamberson's opinion that Plaintiff would be unable to sustain a forty hour work week, which the ALJ rejected. The ALJ's rejection of Dr. Lamberson's opinion shows he considered Plaintiff capable of work on a regular and continuing basis. In addition, the ALJ found Plaintiff had the RFC to perform "light work as defined in 20 C.F.R. § 404.1567(b) except work in a temperature controlled environment; occasional push/pull of her lower extremities; work around things and not the general public; and no excessive exposure to dust, fumes, and gases." R. 21-22. The regulations require the ALJ to determine a claimant's RFC "for work on a regular and continuing basis," 20 C.F.R. § 1545(b) & (c). Therefore, the ALJ's RFC finding should be assumed to reflect his determination of Plaintiff's functional capacity on a regular and continuing basis. There is nothing in the ALJ's decision to suggest his RFC finding was not based upon Plaintiff's ability to work on a regular and continuing basis. Therefore, this argument is without merit.

## V.     CONCLUSION

The court concludes the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence, and that the ALJ applied the proper legal standards in arriving at this decision. Accordingly, the Commissioner's final decision is due to be affirmed. An appropriate order will be entered.

**DONE** and **ORDERED** this ____26th____ day of September, 2013.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE